Court will proceed to the fourth case, Lexington Insurance v. Chicago Flameproof & Wood Specialty. Ms. Weiler. Good morning, Your Honors. May it please the court, my name is Katherine Weiler. I represent Chicago Flameproof in this appeal. This morning we're asking that this court reverse the district court and find that Lexington Insurance owes Chicago Flameproof a duty to defend in this case. In the underlying claims, framing contractor Schweiders alleged damage to property outside the scope of any work that was completed on the underlying projects by Chicago Flameproof. Those allegations of damage to property outside the scope of Chicago Flameproof's obligations on that project identify property damage caused by an occurrence within the meaning of the terms of the insurance contract. As a result, coverage is triggered under the contract and the district court's ruling to the contrary should be reversed. So 950 West Huron talks about this, right, the scope of the Just articulate for me what the scope of Chicago, what your client's project was. Providing flame, FRT lumber, that's correct. And all the other damage then was outside the scope. The damage beyond the removal of the FRT lumber, and to be very clear what I mean by that, Your Honor, I mean the lumber itself. So damage caused outside of the lumber, so the lumber obviously is removed as part of the removal process, but damage to other components of the building, other structural components, and that's where Schweider's allegations about damage to Tyvek paper or to windows or to insulation or to wiring that was not supplied by Chicago Flameproof was entirely outside of the scope of Chicago Flameproof's participation in that project. That damage is what removes this case from the analysis that the district court engaged in. That damage is damage to property outside the scope of Chicago Flameproof's obligations in that project. Is that so, you know, if you have leaky windows and the caulking is insufficient and the water comes in and causes damage to other parts of the facility, that seems a little bit different than the damage caused by pulling your lumber out. This isn't like the building collapsed or the building caught on fire and the whole thing went down because of your faulty lumber. This is more akin to It's not, Your Honor. If it were simply economic loss, the only loss alleged would relate to the lumber itself. Were that the case, we would agree with Your Honor. We would have to concede. If the only claim for damages in this case related to claims for, say, replacement of the lumber, that would be outside of the scope of, I'm sorry, of the insurance policy. That would be within the scope of Chicago Flameproof's obligations. But you can't replace the lumber without pulling out the existing lumber. When you pull out the existing lumber, it's necessarily going to have some effect on the surrounding parts of the building. And that is the obligation of Schweider. So I want to answer the court's question, but I do want to clarify that. What the court is describing is the same situation that occurs in some of the other earlier cases where Illinois appellate courts have evaluated, okay, well, as the general contractor, when you have to make these repairs, you, general contractor, are responsible for providing the finished product. And if you have to remove, if there are leaking windows and you have to remove various components in order to tender a finished product, that's within the scope of your work as the general contractor. In that situation, the court would be correct. And the district court's ruling would also be correct. That isn't this case. And that isn't this case because Schweider's is the general, and Schweider's isn't even to be clear the general contractor, they're a subcontractor, but Schweider's would be more analogous to what the court is inquiring about. That material, so Tyvek paper, for example, just to keep it a little simpler. Sure. I don't know that much about construction, but Tyvek paper, I know what that is. I'm with you, Your Honor, that's basically what I'm doing with that component. That we understand. Tyvek paper is not supplied by Chicago Flame Proof. Tyvek paper is not something that Chicago Flame Proof has any responsibility for. Schweider's does, though, because Schweider's is tendering that finished component of the structure to the general contractor. And the reason that's important is not to implicate somehow that Schweider's is in the wrong at all. It's because it's a different component. It's a distinct piece of the process. It's not something that Chicago Flame Proof is responsible for. And that's what both 950 West Huron emphatically stated, and also, as my opponent tendered to the court, the most recent decision that's directly on point in this matter, which is the Metropolitan case. Metropolitan speaks exactly to that point as well. And in fact, paragraph 56 of Metropolitan, I hate to simply read this to the court, but if the court would bear with me, this is paragraph 56 of the Metropolitan case. The full citation is 2019 ILAP 1st 190517. This is the most recent case. It came down about roughly six weeks ago. The complete paragraph describes exactly the rule that needs to be applied in these types of situations. And it states, quote, the upshot is that in cases involving CGL policies with a definition of occurrence identical or functionally identical to the one here, which ours is, the rule is as follows. If the underlying complaint against the insured contractor merely alleges construction defects that require repair and replacement, or that cause a diminution in value of the contractor's work product, no accident and thus no occurrence under the CGL policy has been alleged. But if the damage extends to other people or things that were not part of the contractor's work product, we have held that this damage is alleged to have resulted from an accident and thus an occurrence has been alleged to trigger by Justice Ellis. And that's this case. This case is damage beyond things that were part of the contractor's work product. Now Judge Barrett, your question also speaks a little bit to the concept of the distinction between indemnity and duty to defend. They're two different things and that's fundamental to the district court's analysis and this court's analysis as well. The district court looked at this in a very strict way and in fact quoted cases that look at this concept in the context of indemnification. Might the court be correct in, might you be correct in your question, Your Honor, if we're talking about indemnification? Possibly. I don't know. That's not the issue. I know, but even in the duty to defend cases, I'm just wondering if there's a difference because even in the new flame proof and wood specialties case that you just, I'm Metropolitan, a wall adjoining two structures collapsed and so it's about the damage that extends outside of that wall. But here nothing collapsed, nothing leaked. It was just that the wood was not to grade, you know, it wasn't fireproof or whatever, and so it had to be removed. And that seems, I'm just asking, does that present a different situation for the duty to defend than when the project fails? It doesn't for a different reason, Your Honor. This comes to, comes back to a different case called McInerney. McInerney is the case, I don't know if the court's had the opportunity to review the cases, that involved an alleged negligent misrepresentation in the sale of a house and ongoing water infiltration issues in a basement of the house. Eventually the homeowners, the original homeowners, were sued by the subsequent owners for alleged negligent misrepresentation and not properly disclosing that defect. And what the Second District Appellate Court did in reviewing the same type of policy languages conclude, well that's an alleged negligent misrepresentation. And in that situation, that also can trigger the policy coverage in a duty to defend case. That's more, I think, what the court is inquiring about. You know, there's not like a collapsed wall, there's not some sort of shoddy workmanship that the contractor performed, that's the problem. The court was asking about a window leaking, for example. McInerney is not about the contractors who performed the work in that basement that may have been defective. It's about the people who made representations related to that work. And I think that's what we're talking about here. Chicago Flame Proof is accused of negligent misrepresentation. They're accused of negligently advising their client that we're providing you with FRT lumber. Now certainly, obviously, Chicago Flame Proof disagrees and contends that it supplied the appropriate product. But the person who was not Chicago Flame Proof made the decision to remove that lumber. And that is the additional piece, even beyond the idea of McInerney and negligent representation, that also changes the court's analysis in this case. Well, how many people were involved in the decision to remove the wood? The removal decision was made by the general contractor, so the person above Schweitzer. They came in and said, hey, that isn't what you advertised. And the whatever they called it, D-Blaze? D-Blaze, that's correct. They said we use D-Blaze. So turns out they didn't use D-Blaze, they used Flame Proof or something. Flame Tech. Very close, Your Honor. Flame Tech. But still, that's not an accident. And that's what I think the judge was talking about, an occurrence. I agree, Your Honor, and I think that's the mistake. The problem is, and Metropolitan speaks to this, this idea of the term accident, you have to look beyond what the First District recently says is the textual language, that word accident, which seems to have been a little bit confusing to the district court, frankly, because it's not about the idea of accident, it's about the idea of occurrence. And that's what both 950 West Huron and scope of that person's project. Then you're beyond the idea of accident. That damage was external to whatever you're talking about. That's exactly right, that's right. And so you're saying somehow, rather, that can be translated into an occurrence. That's correct, and it makes sense in the idea that Chicago Flame Proof providing that lumber, if that lumber were removed and that were the only issue here, there is an understandable analysis about natural and ordinary consequences. You deliberately tendered that lumber, of course you should have known that it would be removed. That's not the correct analysis, though. The question here, that again, triggers a duty to defend. That's why duty to defend is so crucial here. What triggers the duty to defend is the allegation beyond that lumber, beyond the provision of that product, there was additional damage. And what 950 West Huron and Metropolitan state is, that additional damage to other things like anticipated because it was beyond the scope. So it doesn't make any difference that in this case, the damage to the Tyvek paper, etc., came from removing the lumber as opposed to the lumber failing. That's correct, Your Honor, that's correct. Is there any other case? I mean, there's the plumbing case where they pull out the plumbing and they say that's economic loss. Which is different for one critical reason, because decisions about, so that's the, I believe it's the Quest system, I think is how it's pronounced, in the Elger case. That's the Illinois Supreme Court case that discusses in the context of indemnification. Again, a crucial distinction, because we're not talking about indemnification, we're talking about a much lower standard in a duty to defend case. But what Elger was talking about is you have this system, this plumbing system, that is defective, is known to be defective, fails approximately 5% of the time. Certain homeowners experienced defects, there was damage, the system leaked. The Illinois Supreme Court said in that situation, then coverage is triggered. The question though for the Illinois Supreme Court beyond that was, what if it's a prophylactic removal? What if there's no damage and you're removing these systems in advance to try to avoid damage? The Illinois Supreme Court said there is no indemnification in that situation. But beyond that, importantly, the person making the decision about removal was not the person who supplied the product. The decision in that case was being made by the homeowners, the control because it was about duty to indemnify, not duty to defend. Crucially, yes, Your Honor. Yes. If the court, I'm happy to answer additional questions from the court, but if possible I'd like to reserve my remaining time for rebuttal. Okay. Thank you. Thank you, Your Honor. Mr. Silva. Good morning, Your Honors. May it please the court, my name is Mark Subcheck. I'm here on behalf of Plaintiff Appley Lexington Insurance Company. Lexington respectfully requests that this court affirm the district court's entry of judgment in their favor on the determination that they owe no duty to defend or duty to indemnify Chicago Flameproof. There's no accident involved in this case. There's no occurrence involved in this case. What, as the district court correctly held, the natural and ordinary consequence of Chicago Flameproof supplying non-compliant, non-FRT lumber was that it would have to be removed and replaced. And that is the crucial difference between this case and 950 Huron and Metropolitan Builders and National Decorating. In each of those cases, as Judge Barrett, as you identified, the product had failed and it immediately caused damage. Here you had a conscious decision made months later to remove and replace the product because it did not live up to the expectations of the parties purchasing it. Does it matter that it, who made the decision? I don't think it does matter who made the decision in this particular case because if you look at Chicago Flameproof's opening brief, they contend extensively that the decision didn't need to be made at all. They fault the, it was actually the general contractor, the architect, and the owners that ordered the removal of and replacement of the lumber. And there's some materials in the record and it just shows it's largely a product of construction delay. These buildings were not being completed in a timely fashion. But they argue that it was, Chicago Flameproof itself argues that it was completely unnecessary because their product was supposedly up to code. So if that sounds like a voluntary decision to me, they had the option of doing what Chicago Flameproof wanted them to do, which was to try remedial measures like spraying additional retardant and waiting for an additional strength test, but they chose to go do this. It was a completely voluntary decision. And when they did that, the structures, the projects, were in a completely undamaged state. There's no allegations that the Chicago Flameproof's lumber, that the flame tech lumber was warped, that it was twisted, that it was causing the buildings to lean. There's not even an allegation that it was Let's see, the cases that we're looking at here deal with the scope of the project and does it just damage, you know, your piece of it if you're a subcontractor or other things. This distinction that we're talking about, I don't think, correct me if I'm wrong, between something failing and damage to, kind of, collateral damage to Tyvek, etc., because of voluntary removal, that that's not something that's been squarely addressed by the Illinois cases, or has it? I think Elger does address it. You think Elger and the removing of the plumbing? Elger is, in fairness, Elger is an indemnity case. Yeah. But the analysis focuses on what constitutes physical injury, as property damage. Property damage, right. Property damage is defined as physical injury, and it focuses on, under Illinois law, what constitutes physical injury. And in that case, it specifically held that these systems were installed, and I believe the floors and ceilings, and if they leaked, it was covered. If it leaked and caused collateral damage, it was covered. But a small subset of the plaintiffs, and it was a somewhat complex case, but a small subset of the plaintiffs removed it ahead of time, and they claimed damage to surrounding structures when they did it. And here's what the Illinois Supreme Court said, and they kind of state it in the negative, so it's not particularly, you got to struggle with it a little bit, but here's what they say. We therefore agree with the insurers in their cross-appeal that the appellate court erred in finding that coverage under the post-1981 policies, there's, the case involves different policies, may be triggered prior to the occurrence of an actual leak, if in the course of replacing the Quest system, actual physical damage is caused to the home itself. Accordingly, we reverse. So this distinction between the scope of the project, when you're talking about the subcontractor versus the general, doesn't matter in cases of voluntary removal? It arises from an entirely different factual context. Yes, it does. And one thing that Chicago Plain Proof has tried to do in this case over and over is to kind of, the district court relied heavily on the allegations that this was knowing and deliberate conduct, and they've tried to sort of make it out like maybe this was a mistake, but the shipping of the lumber. The allegations are that Chicago Plain Proof made the unilateral decision to ship Flame Tech instead of DeGlaze, that it concealed that it had done so, that it falsely represented that it was fire retardant lumber on the bills of lading, that it later admitted when Chicago Flame Proof, when Schweider's, the underlying sub, just to be clear, Schweider's is the framing subcontractor. I think there was a reference to a general contractor, I just want to be clear about that. They called them up and they said, what you sent us wasn't what we ordered. And Flame Proof said, no, we sent you this other product, it's currently in the process of being tested. There's no way that they could have mistakenly sent lumber that they knew was not certified yet. And Flame Proof has made a significant argument that, well, it met the requirements. They thought, they believed it was flame retardant. Let's assume that Chicago Flame Proof was a hundred percent honest and that the customer, rather than Flame Proof, has grown dissatisfied and is accusing Chicago Flame Proof of misconduct. And we're not talking about the cost of removal, we're talking about then a contract dispute between them about, you know, reduced value of the building. And let's just say, in my hypothetical, that it's really all the customer's fault, that the customer's just trying to get a discount. In that case, would there be a duty to defend? That is a purely, I mean, that is the major distinction that especially travelers makes, is insurance policies aren't performance bonds. There is no coverage. CGL policies, and this goes to Metropolitan, which I'd like to point out is actually a non-final decision right now. We don't know if that's the final word in that case. Rehearing is, I think it's pending on rehearing, but there would still be a petition for leave to appeal to the Supreme Court. But it still is consistent with, but Metropolitan doesn't undercut your point that it's different when a product fails. No, it doesn't. I just want to point out to the court that that decision is still subject to revision. And to get back to your question, Elger specifically says economic losses aren't covered. That's not what insurance policies are meant to cover. They are meant to cover, it goes to the very basics of insurance, which is fortuity. Nothing here fortuitous happened at all. They allege that Flameproof intentionally shipped this lumber in place of what was ordered, hid that they did so, and then after a series of correspondence about what do we do with this non-compliant lumber that's been now been installed in buildings, although those buildings were in a completely undamaged state, they decide to tear it out. Well, they, not necessarily Chicago Flameproof, right? No, not necessarily Chicago Flameproof. They had no control over that. They had no control over it, but it still wasn't accidental. It wasn't unforeseen. It wasn't an unforeseen occurrence. I don't know exactly what the process looked like, but I mean, I envision someone standing there with a completely functional, although albeit non-compliant structure, and literally taking a hammer and knocking the wall down to get to the lumber to not accidental. How is that an unforeseen occurrence? Well, the thing that supposedly would go on is, even when the project is started and they're putting up walls or whatever it is, this so-called FRT, whatever it is, it's not deblaze whatever they advertised. And so, from the start, it wasn't an accident. They put in the argument it is. The non... Compliant. We'll call it compliant. It may have been the same, more or less same stuff, but it wasn't. It wasn't what they claimed it was, and then later on, the architect and the owner and I guess a third person, you know, come in and say, that's not what we ordered, and so you got to take it out. Exactly. And for us, in taking it out, obvious there's going to be collateral damage, I guess. You can't just remove a wall, you know, you got insulation, you got a whole lot of other things. It's a cost to repair and replace. Yeah, lots. And that's not covered. And weren't there three or four buildings? There were there were four buildings. Jeez. At some point, somebody would recognize you got the wrong wood. Well, apparently, according to the underlying allegations, you can't tell by looking at it, which is why it's so important that flame... Well, you have to look at it. Well... I guess there's a label on it or something. Well, it's supposed to be a label. The allegations in the underlying complaint... I've never seen this lumber. I don't know what it looks like. But the allegation in the underlying complaint is that you can't tell one from the other on a purely visual inspection, and that's what we have to go by. That's not a lot of stuff. I would agree. And of the... there were four projects. The... this really concerns... Schweider's complaint concerns three because the same process happened at the fourth, but the general contractor was actually replaced with someone else in that process. So that's why we have the two underlying counterclaims. It happened at all four projects, is my point. And I do want to speak briefly on... counsel has talked about the nature of the duty to defend. It's broad. There's no question it's broad under Illinois law, but even this court has said... it's set in national decorating. It's broad, but it's not limitless. And in this particular case, there is... there's no accident. There's also no property damage, and that goes to the the Elger case, which specifically said property damage means physical injury. The cost to remove and replace perfectly functional, albeit unsatisfactory, plumbing systems and the cost for damage to surrounding property is simply not physical injury. Counsel talked about the McInerney case, which is the Second District case, and I did want to distinguish that case because that turned... the ultimate holding in that case turned on the fact that the complaint, the underlying complaint against the insured, did not foreclose the possibility that they had failed to disclose a leaky basement accidentally. Well, that's not the case here, because as the District Court recognized, the allegations, when you read the complaint as a whole against flame proof, as you're supposed to do under the course of knowing and deliberate conduct. So McInerney is different in that case because... is different than this case, because there, the possibility was not foreclosed. Here, Schweider's underlying allegations do foreclose it. And I want to make one point about counsel's, or flame proof's, contention was that flame tech, the lumber that was supplied, that they believed that it was FRT lumber. But that is just consistently rebutted by Schweider's underlying allegations. For example, paragraph 34 of the underlying main federal complaint said, the bill of lading accompanying each delivery of lumber from Chicago flame proof to Schweider's prominently identified the product as FRT lumber. Chicago flame proof never notified Schweider's that the lumber it delivered had not been tested, listed, or labeled in accordance with IBC requirements, and that as a result, the lumber delivered was not actually FRT lumber. So insofar as they are claiming that their belief that it satisfied the requirements, it met all the requirements, it just wasn't certified, they're one in the same. It's certified FRT lumber, or it's non-certified non-FRT lumber. And this had not yet been certified. This had not yet been certified. The final certification did not happen until a month after the decision was made to rip and tear out the existing lumber. Well, but also, I don't know how long this construction took, how long this length of time, that nobody noticed that this was the wrong product. The lumber was installed between March and June of 2016. Schweider's, the contractor, was non-compliant when it started receiving default notices and a phone call from the general contractor. They sent them default notices, you're not performing the contract under the project manuals. How it was discovered that it was non-compliant is not entirely clear from the record, I'm not sure if it was from a building inspection, I believe that's the case, but it's not entirely clear. So the project was ongoing for two and a half months. So the only people that knew this was not the right stuff was the... Was flame proof. Flame proof. That's correct, Your Honor. I guess that's what you're saying. And it, I guess it's just speculative to say why didn't somebody discover this a lot sooner, but they didn't. I think that goes back to the allegations that, I mean, this isn't a commercial product. When it came, there was, according to the underlying complaint, there was no way to, there was no way to visually identify it. And the bill of lading said it was FRT lumber. Well somewhere along the line that there's some kind of a stamp that goes on it or something, isn't there? Yes, correct. So you really can identify it when it comes off the truck. You'd think, but that's not the underlying allegations. I know. Okay. I see that I'm out of time, Your Honor. Lexington respectfully asks that this Your Honors, Lexington says emphatically this is not an accident, but that's not the term we look at. We look at the term unforeseen circumstance, and absolutely this is unforeseen. How could Chicago Flame Proof have anticipated that the lumber it supplied, and I want to walk you, Judge Mannion, through the timing again on this. The lumber it supplied that the parties agreed prior to who would have anticipated that despite it being compliant, the architect would still say, I don't care, rip it out, do whatever you have to to this property. Here's why the timing is important, Your Honor. Counsel's correct. The buildings were constructed very roughly March into June. The notices, the deficiency notices came out in during June when the architect was saying, I don't think this Chicago Flame Proof advised Schweider's by early July, and this is in the complaint, that all of the testing had been completed and they were ready to re-stamp the lumber. So the lumber is still in place and can be used properly as FRT lumber, but at that point the architect says, we don't care, we want you to undergo another test, and then even before they get the results of that test, which are fine, which agree it should be IBC certified, before they get the results, that's unforeseen. How could Chicago Flame Proof have anticipated that? Why isn't it like a performance bond? It's not a performance bond. Your Honor was asking about what if it were simply diminution in value, essentially. What if there were an argument about breach of contract, the property is worth less than we anticipated, that's pure economic damages. That would be more akin somehow, someway to some sort of insurance bond saying we absolutely will cover any damages. That's not this case. This case is an unforeseen situation that Chicago Flame Proof could not have anticipated. The removal of lumber that satisfied the building requirements, and the architect saying, I don't care, pull it out, damage everything around it, do it anyway. What do you say it's unforeseen? They knew it was not what that was ordered. That's true. That's, well, I guess I shouldn't, I can't say that's true, Your Honor. It wasn't DeBlaise distributing. Because, well, to be very clear, DeBlaise is not the product that was ordered. The court is correct that FRT lumber was ordered. They're two different things. It's essentially like ordering the generic and ordering the name-brand. In this case, it is absolutely true that the allegations are, look, the generic doesn't satisfy the requirements, the name-brand does, that's why we ordered the name-brand. I'm not, I don't want to mislead the court about that. Nonetheless, that's the distinction. There wasn't a specific order of DeBlaise, at least that's not, the allegations in the case are that DeBlaise ordered FRT lumber. You say it's not foreseen, Ms. Weiler, that an architect would sort of parachute in later. Is that your argument? No, Your Honor. It's that, it's unforeseen that an architect who, the underlying complaint doesn't speak to this. Presumably the architect is involved in keeping an eye on the construction project. What's unforeseen is you have a situation where the lumber is installed, there's an issue with the lumber, everybody confers there's an issue with the lumber, can we resolve it? And Chicago Flame Proof, the supplier, comes back and says, yes, we can resolve this, it's fine, it's found to be compliant with the requirements of the code, and they sent it off for an additional test that the architect asked for, presumably because the architect wanted to confirm, all right, if it's code issue, there's not a, there's not harm. But it's, it is foreseen, is it not, that an architect is involved? Yes, absolutely. No dispute about that. That's not the unforeseen part. The unforeseen part is anyone, the architect, the general contractor, the owner, anyone making the decision, I don't care that this is an entirely appropriate product. So the gratuitous tearing down of the building, or of this part of the building. Exactly. Who would anticipate that? Would you anticipate saying, just rip down the entire house because the tile floor isn't the exact color that I selected? Or, and then you realize when you look at the bill of lading, actually, or the order form, that is the color that I selected. It, that is not foreseeable. You cannot anticipate that the person in charge of the building project is going to make a decision so contrary to that person's economic interests by saying, just rip it out. That is unforeseen. And that's why we get back to this idea, and I realize I'm past my time, but just to be very clear, two things about that. One, the idea that it's beyond the scope of what Chicago Flame Proof did. Chicago Flame Proof supplied this lumber. It could not have foreseen that no matter what, in whatever circumstance, there will be damage beyond that lumber. And number two, again, it's a duty to defend case. That's the point. These issues need to be resolved in order to determine whether or not there's indemnification. This isn't an indemnification argument. It's a case. If the court has no further questions, we ask that the court reverse the district court and order judgment for Chicago Flame Proof. Thank you, Ms. Wallace. Thanks to all the council. Case is taken under advisement.